Myles J. Lane, J.
Motion Nos. 48 and 69 are consolidated and determined herein.
The Attorney-General initiates this proceeding pursuant to subdivision 12 of section 63 of the Executive Law to compel respondents engaged in the rental of housing accommodations to place security deposits of their tenants in an interest-bearing bank account. Respondents move to dismiss the petition for legal insufficiency.
The petition is based upon the recent amendment to section 7-103 of the General Obligations Law effective September 1, 1970, which provides in essence that security moneys received by the lessors of certain apartment units are to be deposited in interest-bearing accounts for the benefit of tenants.
The Attorney-General maintains that this amendment applies to security moneys received not only subsequent but prior to the effective date of the amendment. That respondents’ failure to deposit security moneys received by them prior to September 1, 1970 demonstrates persistent illegality within the purview and intent of subdivision 12 of section 63 of the Executive Law.
Respondents argue that the amendment does not apply to security deposits received prior to the effective date thereof; that the retrospective application of such amendment would represent an unconstitutional impairment of respondents’ contractual rights; and that the Attorney-General has no standing to bring this proceeding under subdivision 12 of section 63 of the Executive Law.
Respondents, on September 1, 1970, had about $919,000 security deposits in noninterest-bearing accounts, which they refused to transfer to interest-bearing accounts after said date. Respondents make no issue that they are required to deposit security moneys received after September 1, 1970 in an interest-bearing account. Section 7-103 as amended reads (underlining supplied):
‘ ‘ Money deposited or advanced for use or rental of real property; waiver void; administration expenses
“1. Whenever money shall be deposited or advanced on a contract or license agreement for the use or rental of real property as security for performance of the contract or agreement or to be applied to payments upon such contract or agreement, when due, such money, with interest accruing thereon, if any, until repaid or so applied, shall continue to be the money of the person making such deposit or advance and shall be held in trust by the person with whom such deposit or advance shall be made and shall not be mingled with the personal moneys or become an *38 asset of the person receiving the same, bnt may be disposed of as provided in section 7-105 of this chapter.
“2. Whenever the person receiving money so deposited or advanced shall deposit such money in a banking organization, such person shall thereupon notify in writing each of the persons making such security deposit or advance, giving the name and address of the banking organization in which the deposit of security money is made, and the amount of such deposit. If the person depositing such security money in a banking organization shall deposit same in an interest bearing account, he shall be entitled to receive, as administration expenses, a sum equivalent to one per cent per annum upon the security money so deposited, which shall be in lieu of all other administrative and custodial expenses. The balance of the interest paid by. the banking organization shall be the money of the person making the deposit or advance and shall either be held in trust by the person with whom such deposit or advances shall be made, until repaid or applied for the use or rental of the leased premises, or annually paid to the person making the deposit of security money.
“ 2-a. Whenever the money so deposited or advanced is for the rental of property containing six or more family dwelling units, the person receiving such money shall, subject to the provisions of this section, deposit it in an interest bearing account in a banking (organization which account shall earn interest at a rate which shall be the prevailing rate earned by other such deposits made with banking organizations in such area.
“ 2-b. In the event that a lease terminates other than at the time that a banking organization in such area regularly pays interest, the person depositing such security money shall pay over to his tenant such interest as he is able to collect at the date of such lease termination.
“ 3. Any provision of such a contract or agreement whereby a person who so deposits or advances money waives any provision of this section is absolutely void.
“4. The term ‘ real property ’ as used in this section is co-extensive in meaning with lands, tenements and hereditaments.
‘ ‘ § 2. This act shall take effect on the first day of September next sueeeding the date on which it shall have become a law.”
Matter italicized is new (added by-L. 1970, ch. 1009), approved by Governor on May 20, 1970 in the following Memorandum (McKinney’s 1970 Sess. Laws of N. Y., p. 3145):
*39 “ Real-Estate Security Deposits
“ On approving L. 1970, c. 1009, requiring security deposits made by tenants to be placed in an interest-bearing bank account, the Governor stated:
May 20,1970
“ The bill, effective September 1, 1970 will .require the landlord of every apartment house with six or more apartments to place any security deposits made by his tenants in an interest-bearing bank account.
‘1 Tenants will be entitled to receive the interest paid on their deposits, less one per cent, which the landlord will be allowed to retain to cover his administration expenses.
I ‘ This bill, except for the limitation in its application to buildings with six or more apartments, has been a part of the Attorney General’'S legislative program for several years.
“ I am pleased to give my approval to this measure.
II The bill is approved.
Nelson A. Rockefeller ”
Prior to 1935 the receipt by landlord of a security deposit created a debtor-creditor relationship, although the courts were beginning to hold that the landlord was in effect holding the deposit as a trustee (Madison Realty Co. v. Weiss, 133 Misc. 318 [App. Term, 1st Dept.]).
In 1935 section 233 of the Real Property Law (now General Obligations Law, art. 7) was enacted, which provides among other things that a security deposit is the property of tenant and shall be a trust fund to be kept separate and apart from landlord’s funds. It was further amended to provide that the person receiving the same shall hold such moneys in trust (L. 1943, ch. 584) (Mallory Assoc. v. Barving Realty Co., 300 N. Y. 297).
Prior to September 1, 1970, the effective date of the amendment of the General Obligations Law, section 7-103 provided that the security deposit remained the property of the tenants; that a landlord could not commingle the tenant’s deposit with his own funds; that whenever a landlord deposited funds in a bank, he must too notify the tenant, giving the name of the bank and the amount of the deposit; that these same obligations, respecting the landlord, apply both to the deposit and interest accruing thereon, if any; and that no waiver of any provision of the section was permitted.
The 1970 amendment to section 7-103 required that the security money be deposited in interest-bearing bank accounts.
It is abundantly clear that the security money is the property *40 of the depositing tenant. It remains the property of tenant until there has been a default or breach of a covenant of the lease and at which time landlord may appropriate the deposit in accordance with the terms of the lease.
The court takes judicial notice of the fact that hundreds of thousands of apartments in the City of New York are under rent control. It is evident that the Legislature, in the enactment of the 1970 amendment, was aware of rent control in New York City, the acute shortage of apartments, and the low turnover rate of apartments.
The 1970 amendment would have little impact if it were to apply to the occasional tenant moving in for the first time. The amendment should be liberally construed. It should not be read to limit its effectiveness to new money given to landlord for security purposes after September 1, 1970. The history of the statute is indicative of the fact that, from its very inception, its objective was to protect the tenant in the area of security deposits. This has been emphasized by virtue of the fact that over the years the legislative trend has been in the direction of tightening this protection.
To limit the amendatory statute solely to new money would give a narrow reading to the statute and defeat its purpose to provide that all security deposits held by landlord shall be placed in an interest-bearing account beginning September 1, 1970. The statute, though enacted several months prior thereto, was to afford a landlord an adequate opportunity to transfer deposits into interest-bearing bank accounts.
It may be the fact that some landlords are receiving derivative benefits from banks as a result of maintaining the security deposits in noninterest-bearing accounts. The fact that such a practice may exist does not create in the landlord a property or a vested right in such derivative benefits.
The asserted economic hardship in affecting landlord’s credit in the banks where such noninterest deposits are maintained is irrelevant. The Legislature provided that 1% interest be given to landlord for the administrative work in connection with such deposits. It need not have done so.
In any event, there is no proof that respondents here are adversely affected by the transfer of the security deposits into interest-bearing accounts.
The presence of noninterest clauses in leases is of no significance here. The landlord was not compelled under the statute as it read prior to September 1, 1970 to place the security money in an interest-bearing account.
*41 In enacting the statute in its original form affording the landlord the grace of maintaining such security deposits in either interest-bearing or noninterest-bearing accounts, the Legislature cannot be deemed to have made any promise to landlord that it would not change the direction as to deposits when it felt such change to be in the public interest (I.L.F.Y. Co. v. City Rent & Rehabilitation Administration, 11 N Y 2d 480, 491).
Under the Rent Stabilization Law, similar to the situation in pre-1947 rent control, there was a rollback of rents in leases with stipulated rent adjustments, usually increases. The law was upheld (8200 Realty Corp. v. Lindsay, 60 Misc 2d 248, affd. 27 N Y 2d 124; see, also, Mercado v. Walsh, 65 Misc 2d 616). The principle of rollback had been established in several prior cases instituted by landlord (see Wasservogel v. Meyerowitz, 300 N. Y. 125; Twentieth Century Assoc. v. Waldman, 294 N. Y. 571).
Generally, statutes which are remedial in nature are entitled to a liberal construction in aid of the object sought by the Legislature and with a view to the beneficial ends proposed (Fischer-Hansen v. Brooklyn Hgts. R. R. Co., 173 N. Y. 492; Saxon v. Saxon, 178 Misc. 781; Allen v. Stevens, 161 N. Y. 122).
Corrective legislation is necessarily retrospective in its operation. A remedial statute may affect past transactions, and where it appears that the legislation intended to provide a remedy for evils existing, as well as those likely to occur, it will be extended to such cases, although there are no retrospective words in the act (People ex rel. Pells v. Supervisors of Ulster County, 65 N. Y. 300).
Respondents ’ emphasis upon some words of the statute - as amended to indicate prospective application thereof is misplaced, in the light of the reasons which caused its enactment and the abuse it sought to overcome. The courts are not bound to follow the literal wording of a statute where ‘ ‘ literal construction of the statute would produce a result which the Legislature plainly did not intend.” (Matter of Russo v. Valentine, 294 N. Y. 338, 342).
It is fundamental that ‘ ‘ The intent of the Legislature in enacting legislation is the primary object to be found. Whenever such intention is apparent it must be followed in construing the statute * * * a thing which is within the letter of the statute is not within the statute unless it be within the intention of the lawmakers * * *. It is a familiar legal maxim that ‘ he who considers merely the letter of an instrument goes but *42 skin deep into its meaning, ’ * * * not according to the letter.” (Matter of Astman v. Kelly, 2 N Y 2d 567, 572).
The contemplation and intention of the sponsors of the amendment in preparing it for the Legislature was to place all security deposits in interest-bearing’ accounts. Unless this construction shall prevail, the statute would seem to be entirely abortive.
It is the court’s opinion that the amended statute requires a landlord to deposit rent security funds in an interest-bearing bank account, regardless of when acquired, beginning with September 1, 1970.
Respondents challenge the Attorney-General’s standing to bring this suit. They refer to the opinion in Matter of State of New York v. Parkchester Apts. (61 Misc 2d 1020, affd. 34 A D 2d 1106) which was affirmed by the Court of Appeals on the opinion of Mr. Justice Sarafite at Special Term (28 N Y 2d 842).
In Parkchester, the Metropolitan Life Insurance Co. had voluntarily deposited .security moneys of the more than 12,000 tenants of Parkchester in interest-bearing accounts. Upon the sale of Parkchester, the purchasers transferred such security moneys from interest-bearing’ accounts to noninterest-bearing’ accounts. The Attorney-General charged that such action was fraudulent and illegal conduct. He instituted a proceeding to compel the return of the tenants’ securities into interest-bearing accounts as before.
In that suit there was no statute upon which fraud or illegality could be based. The Attorney-General did not argue that section 7-103 by itself alone imposed an obligation upon the landlord to keep the money at interest. The thrust of the Attorney-General ’.s argument was that the purchasers were fiduciaries who were required to use the funds productively but were using the security money for their own economic advantage, to the detriment of the tenants who previously were credited by Metropolitan Life Insurance Co. with interest on their security money.
Here, there is a specific statute, amended after the determination of the Parkchester case, which was introduced by the State Senator in whose district the Parkchester tenants resided. In the Parkchester case, the court did not find fraud or illegality, a required showing under subdivision 12 of section 63 of the Executive Law, or the existence of any statute which the purchasers violated. It stated that (p. 1027): “ There is no contractual responsibility upon the part of the purchaser to maintain the security deposits in an interest bearing account. Even *43 if there were, the dispute would be limited to tenants of Parkchester and the purchaser. It would be a controversy in which the Attorney-General has no statutory authority. The only other possible basis for an action by the Attorney-General would be on the ground that any claimed breach of contract on the part of the purchaser amounted to an illegal act. A mere breach of contract, even if it existed, cannot constitute 'an illegal act.”
The Attorney-General had no standing in the Parkchester case because of the absence of a statute bearing' upon the transaction, and it involved only a contractual relationship. There was no statute interdicting the conduct of respondents there. Here, the Legislature enacted the amendment to section 7-103, the violation of which gives the Attorney-General standing because of illegal conduct. He is authorized to enjoin illegal acts in the carrying on of a business (Matter of La Belle Creole Int. v. Attorney-General of State of N. T., 10 N Y 2d 192, 197).
After Parkchester the Legislature also enacted an amendment to article 22-A of the General Business Law (§ 349) which makes ‘ ‘ deceptive acts and practices unlawful ’ ’ and authorizes action by the Attorney-General “whenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or purchases stated to be unlawful ”. The Deceptive Practice Act embraces ‘ ‘ business, trade or commerce or in the furnishing of any service in this state.”
Accordingly, the application by the Attorney-General is granted. The cross motion is denied.